. J. P. MARTIN, Appellee, v. C. R. STOUT, Appellant.

.**Partnership:** ACCOUNTING: EVIDENCE. In this action for an accounting between partners, as agents for the sale of real property, the evidence is held to show that plaintiff received a commission for effecting an exchange of stock in another firm, of which he was a member, for land; and that the defendant, his partner in the transaction, was entitled to share in the commission as firm profits.

·*Appeal from Harrison District Court.*—HON. W. R. GREEN, Judge.

WEDNESDAY, APRIL 5, 1911.

ACTION for an accounting between plaintiff and defendant in relation to their partnership business as agents for the sale of real estate. There was a decree that plaintiff recover from defendant the sum of $1,149.86, and defendant appeals.—*Modified* and *affirmed*. '  .

*C. W. Kellogg,* for appellant.

*J. S. Dewell,* for appellee.

DEEMER, J.—The accounting covers various items or receipts and disbursements by the partners as to which there was some controversy in the trial court. But practically the only contention in argument here is as to the failure of plaintiff to account for $1,880 in cash received in a transaction which involved the transfer of the stock of the Devore Novelty Company, a partnership of which plaintiff was a member, and $6,000 in cash to one Pond in exchange for what is described as the San Luis Valley land in Colorado, and the sole question of fact at the basis of this controversy is as to whether plaintiff received this $1,880 as commission from Pond in effecting this transfer. The trial court found that this money was received by Martin as a commission, but that he should account to the novelty company or the stockholders thereof, and therefore reached the conclusion that plaintiff was not bound to account to defendant for one-half of the amount.

It is contended for appellant that Martin received this money as commission for the sale, and that he should account for the same to the defendant. The parties conceded that under the partnership arrangement each was entitled to deal with his own property without accounting for any commission to the other, and it is claimed that the amount received or retained by Martin in connection with the transfer of the stock of the Devore Novelty Company was with reference to his own personal matters and should not be considered on this accounting. Plaintiff Martin was a stockholder in an Iowa corporation known as the "Devore Novelty Company." This company, or the members thereof, traded the stock of said company to one Pond, who resided in Colorado Springs, Colo., for some land lying in what is known as the San Luis Valley. In connec-

tion with this trade he (Martin) received $1,880, in cash from Mr. Pond. Martin says that in this trade he was acting for Devore Novelty Company. His testimony with reference to the matter is as follows: "The way this deal came up with the novelty business, I took the matter up with Yates & McClain and Lougee of Council Bluffs on a trip to the San Luis Valley myself, and I made the deal finally later on. When I made that deal, Charles Pond owned the San Luis Valley land. Charles Pond paid me $1,880, but not as a commission. I demanded it from the company. The company were paying him his price for the $22,000. They paid cash, the difference between what they traded and what the land came to. They paid $6,000 cash and a mortgage for $11,000. As a matter of fact, Pond paid in cash $1,880 at the time the trade was made. We don't deny it. And that was not any part of the $6,000 I paid him. I still have got the $1,880. I do not know as I ever talked with any member of the company before getting the $1,880 that I was to give it to them or any part of it."

It is true that Martin claims he did not receive the money from Pond as a commission; but the testimony shows that the president of the novelty company understood that the amount paid to Martin was a commission from Pond. This witness testified as follows: "I knew Martin and Stout were in partnership. They were partners at the time and conducted a real estate business. I knew Mr. Martin was acting as agent for Yates & McClain when he was dealing in this land with the Devore Novelty Company. I understood he was working for Yates & McClain before the trade was made." Yates & McClain, the parties referred to by the witness, were interested with Pond in the Colorado land, and Martin & Stout were acting with them and with others in disposing of the land. The president of the company also testified as follows: "This $1,880 was made, as I understand, from the land deal.

Mr. Martin closed up the land deal. I do not know exactly when Mr. Martin got it. Since that time Mr. Martin has said something about putting it in a jack pot. When we bought this land, each one of us put up our share to make up the $6,000."

The vice president gave the following testimony with reference to the matter: "Prior to the time the trade was made and finally consummated, I heard nothing of Mr. Martin receiving a commission. The first I heard that Mr. Martin had received a commission from Mr. Pond for trading or selling the land to the Devore Novelty Company was after the trade was made. I think it was about the time that Mr. Martin and Mr. Stout were having their controversy over this commission, that I first received this information. Mr. Martin has never turned any of this money over to me from this commission he has received. There was some talk between Mr. Martin and stockholders in which Mr. Martin stated, in substance, that he would pay Mr. Stout one-half of that commission when the land in the San Luis Valley was sold, or words to that effect. Mr. Martin told me that (referring to the above) after he and Mr. Stout had separated and dissolved partnership. It was at the time controversy between he and Mr. Stout was being discussed. I knew nothing about Mr. Martin receiving a commission prior to the time the deal was closed."

Another witness who was interested in the deal, and who was in the employ of Pond, the landowner, testified as follows: "At some stage of the proceedings in which I took part, there was a talk of a commission being paid, but I do not know whether it was to go to Martin & Stout, or to whom it was to go. Q. Before you closed the deal, was there anything said about the firm of Martin & Stout having a commission? A. I do not know who was to have it. Somebody was to have it. Afterwards I learned that Pond paid Martin. I knew before the deal was closed. I knew

they were to be paid. That a commission was to be paid to Mr. Martin. I do not recall that I had any talk with Mr. Stout about it. Mr. Martin in the first agreement was to have $1 per acre for all the land he traded with the people for these parties. There were one thousand two hundred and eighty acres traded to the Devore Novelty Company. Mr. Martin didn't say that, 'before I will let this deal go through, you will have to pay me one dollar and a half an acre, or $600, additional.' That was a proposition made to him that they would pay him $600 additional if he would get this deal through."

The defendant testified as follows with reference to this commission: "I did not have any talk with Mr. Martin with reference to this $1,880 commission before the 30th day of March, when I finally had trouble with him. He told me one time that they had offered $1,280, $1 per acre, for commission, and that he got Greenshields and Lougee to split their commission of $1 per acre, so he got $600 out of them and $1,200 from Pond. Pond was the man who owned the land. Martin stated the reason why he could not divide his commission was because it was his own deal. The firm of Martin & Stout had been acting as agents for the San Luis Valley land under Greenshields, Pond, and others ever since the fall of 1907. At the time this Devore Novelty Company matter came, Mr. Martin and I talked it over quite often. He suggested that I get Mr. Zahner to go out and look the land over, and that his influence would help make the trade. I talked with Mr. Deur and Dr. Devore, members of the Devore Novelty Company, several times about this trade before the trade was made. On this 30th day of March, 1908, I told Mr. Martin we ought to have a kind of checking up, that I had some money on hand, and he had collected this commission, and we ought to have a divide-up and see how we stood. He said he did not have any division to make on

the $1,880, and I asked him why he did not expect to divide it. He said it was his own personal deal."

Plaintiff, although not denying much of this testimony, says that he did not receive the money as a commission; that, if he did so receive it, it was compensation to him for selling his own property; and that, in any event, he may be liable to the novelty company, and that no judgment should be rendered against him. He testified, however, that he received the $1,880 in cash from Mr. Pond as a concession from him; that it was not a commission, and that he did not say anything about it to his co-stockholders in the novelty company about getting the money until after the deal was closed and after this suit was commenced. True he qualified this last statement a little; but he always insisted that he did not receive the money from Pond as a commission, preferring to call it a concession made by Pond. The amount was not taken from the purchase price, but Martin received it in cash from Pond. He told the cashier of the bank in his town that the time for Stout to get his commission was after the land was all sold, "and we were out clear, and had a profit of $940; then it was time for him (Stout) to come in." There was other outside testimony tending to show that the novelty company was represented by certain of its officers in finally closing the Colorado land transaction, and that plaintiff Martin was really acting for Pond, instead of for the company or its stockholders. The trial court was of the opinion that the money in dispute was a commission received by plaintiff from Pond, but that, as he (Martin) might be held liable to the novelty company, he should not be compelled to divide the money with his partner, Stout. Neither the novelty company nor any of its stockholders, although fully advised, at the time this action was commenced, of the facts, has ever made any claim upon Martin for any part of the money received by him from Pond. The vice president, who was one of the active members of the company, testified that the

company never recognized the firm of Martin & Stout as being in any way connected with the company in connection with the land deal. He also testified that plaintiff stated to him that when the land was finally disposed of he would give Mr. Stout, the defendant, one-half of the commission, and no objection was made by this officer to such an arrangement. Another witness testified that Mr. Dewell arranged the terms of the exchange for the Devore Novelty Company.

Upon this testimony we are constrained to hold that Martin exacted a commission from Pond for working up the deal, that he received it as such, and not for the benefit of the company or the stockholders thereof. This is confirmed by the thought that although the officers of the company were witnesses upon the trial and knew of the claims of the various parties, they did not intervene in this action or make any claim that either they or the company or the stockholders were entitled to any part of the money collected by Martin from Pond. This being true, it follows that Martin should account to the defendant for one-half the commission received by him (Martin) upon this deal. It is not, sufficient answer to this to say that some time in the future the novelty company may make some claim upon plaintiff or upon the old firm of Martin & Stout. The decree rendered by the trial court is erroneous, in that plaintiff was not charged with $940, being defendant's share of this commission, and the judgment against the defendant should be reduced by that amount, leaving the sum of $209.86 as the amount due from defendant to plaintiff. Other items of account need not be considered, as the findings of the trial court with reference thereto have sufficient support in the testimony. The credit which we have found should be made as of the date of the original decree, to wit, June 4, 1909. Plaintiff will pay three-fourths and the defendant one-fourth of the costs of this appeal.—*Modified* and *affirmed.*